IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2020

## LUIS JORGE DIAZ v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1673       Angelita Blackshear Dalton, Judge**

_____

### No. M2019-01000-CCA-R3-PC
_____

The Petitioner, Luis Jorge Diaz, was convicted of six counts of aggravated sexual battery and subsequently sentenced to twenty years in confinement. See Tenn. Code Ann. § 39-13-504. Following an unsuccessful direct appeal, the Petitioner filed a petition seeking post-conviction relief, alleging, among other things, that trial counsel was ineffective because of his failure to communicate multiple plea offers from the State to the Petitioner. The post-conviction court denied the petition, and the Petitioner filed a timely appeal. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Jay Umerley (on appeal); and Andrew Chad Davidson (at trial), Nashville, Tennessee, for the appellant, Luis Jorge Diaz.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Tammy Haggard Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### FACTUAL BACKGROUND

This case concerns a stepfather's intimate touching of his six-year-old stepdaughter ("the victim"). Following a jury trial, the Petitioner was convicted of six counts of aggravated sexual battery and sentenced to ten years on each conviction, with

two counts to be served consecutively, for a total effective sentence of twenty years' incarceration. See State v. Luis Jorge Diaz, No. M2014-01685-CCA-R3-CD, 2015 WL 5472288, at *1 (Tenn. Crim. App. Sept. 18, 2015), perm app. denied (Tenn. Feb. 18, 2016).

*A. Trial*

As relevant to the issues raised in this appeal, the facts underlying his convictions are as follows:

A. R.[1], the victim's grandmother, allowed her daughter, the victim's mother, C. D., along with the victim, the victim's siblings, and the Petitioner, to live with her intermittently during 2010. The victim's mother and the Petitioner had met a few years before in 2008. During this stay, the victim's grandmother observed the Petitioner interact "pretty well" with the children, but the Petitioner seemed to focus most of his attention on the victim. While staying at A.R.'s house, the victim, C.D., the Petitioner, and the other children would all sleep in the same room.

Irene Reed, a family friend, had been keeping some of the children, but returned the children to A. R.'s home when the family began staying there.

Upon moving out of A.R.'s home, A. R. continued to notice the Petitioner's attention towards the victim. A. R. described the family's living situation as nomadic, with the family moving from houses to apartments intermittently. Around Halloween 2011, C. D. and her children once again moved back into A. R.'s home. A. R. did not allow the Petitioner to live there at this time.

Around the same time, one of C. D.'s older sons told A. R. that the victim had made allegations of sexual abuse against the Petitioner. A day or two later, the victim called A. R. to tell her the she was going to Mexico with the family. However, a few days later, C. D., the victim, and other children returned to A. R.'s home and C. D. filed an official report on the victim's allegations.

At trial, the victim testified that she was eight years old at the time, and she identified the Petitioner. The victim asserted that the incidents in question took place at the family's old apartment and at A. R.'s home. In the old apartment, the victim and the Petitioner slept on the floor together, and three incidents happened there. The Petitioner

---

[1] It is the policy of this court to protect the identity of minors who were the victims of sexual crimes; as such, we will refer to the victim's immediate family members by their initials.

pushed his genitalia against the victim's genitalia; the Petitioner used the victim's hand to "go up and down" his penis; and the victim awoke one night to find that her hand was placed inside the Petitioner's pants. Additionally, an incident took place in the apartment living room when the Petitioner touched the victim's genitalia with his fingers and in the kitchen when the Petitioner sat the victim on a counter in front of him, but she could not recall what happened next. The incident at A. R.'s home took place in the bathroom when the Petitioner grabbed the victim's hand and moved it "up and down" his penis.

The victim told her mother and her grandmother about these incidents. The victim stated that no one asked her to make these allegations.

Jill Howlett testified that she worked as a social worker for Our Kids Center and had interviewed the victim. The victim told Ms. Howlett that the Petitioner had touched her genital area and buttocks with his genitals, over her clothing, on multiple occasions. Additionally, the Petitioner had touched the inside of the victim's genital area with his fingers. The victim told Ms. Howlett that the Petitioner had put her hand on his penis and would move it back and forth. The Petitioner would make the victim hug and kiss him every night, and the Petitioner would lick her teeth when he kissed her.

Metro Nashville Police Detective John Ferrell testified that he was present for the Petitioner's interview. During this interview, the Petitioner explained that the victim's allegations were a product of the victim's older brothers' influence, C. D.'s anger toward the Petitioner for ending their relationship, and the victim's anger for witnessing a physical and verbal altercation between Petitioner and C. D. on Halloween 2011.

The Petitioner called C. D. to testify in his defense at trial. C. D. asserted that the Petitioner became controlling of her and the victim about a year after the two were married. C. D. explained that the Petitioner did not like her older children and eventually the relationship ended. A few weeks after the separation, the victim told her about the allegations. When C. D. asked the victim why she did not tell her about the abuse sooner, the victim replied that Petitioner had told her he would find out, and she was afraid C. D. would be angry.

C. D. did not cut off contact with the Petitioner after the victim's allegations. C. D. continued to see the Petitioner and wrote him letters while he was in jail. On cross-examination, C. D. asserted that she initially tried to protect the Petitioner and had planned to drive with the Petitioner and her children to Mexico to protect him from prosecution. However, she returned when the victim said she would be fine with the Petitioner as long as he was not in her bed.

Seccorro Moreno, the Petitioner's mother, testified that the family lived with her for a time and that the Petitioner treated all of C. D.'s younger children the same. Ms. Moreno asserted that the Petitioner was very upset when C. D. and the children moved into A. R.'s home without him. Ms. Moreno described an altercation between C. D. and the Petitioner on Halloween 2011.

The Petitioner testified in his own defense. The Petitioner and C. D. had one biological child together. After C. D.'s older children came to live with the family, the Petitioner asserted he began locking doors in the home to keep the younger children from being exposed to inappropriate language and content from the older children. The Petitioner had arguments with the older children. Soon after C. D. and the children moved into A. R.'s home, the Petitioner told C. D. he wanted to end their relationship. The Petitioner testified that C. D. responded by threatening to call the police and telling them the Petitioner had raped her. Soon after, C. D. told the Petitioner about the allegations the victim had made against him. The Petitioner spoke about the altercation on Halloween 2011.

The Petitioner asserted that the victim was lying and that he would never hurt her. He agreed that he sometimes slept on the floor with the victim, but he treated all of the children the same. However, on cross-examination he recanted and said he slept in bed with C. D.

## B. Post-Conviction Hearing

On January 9, 2017, the Petitioner filed a pro se petition seeking post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition on February 27, 2017. On May 25, 2017, a second amended petition was filed, wherein the Petitioner alleged he received ineffective assistance of counsel in the following ways: (1) failure to communicate multiple plea offers from the State; (2) failure to withdraw or attempt to withdraw from the case when communication became an issue; and (3) failure to properly investigate potential witnesses.[2] The post-conviction court held an evidentiary hearing on May 3, 2019.

Trial counsel testified that he had been practicing law for twenty-three years and practiced almost exclusively criminal law for twenty years. Prior to the Petitioner's case, trial counsel had represented clients on rape and sexual harassment charges, including those involving children. Trial counsel estimated that he represented the Petitioner for

---

[2] Although the Petitioner raised several other grounds of ineffectiveness in his multiple petitions for post-conviction relief he has abandoned those on appeal. Accordingly, these issues are waived.

"just a little over two years," but could not be sure because he disposed of files after "a certain amount of years," he recalled that he worked "seventy to eighty hours total" on the Petitioner's case.

Trial counsel first met with the Petitioner while he was in custody. Trial counsel testified that the Petitioner maintained that he "didn't do any of the things he was accused of" and did not want to serve jail time. Trial counsel recalled "several [plea] offers" prior to trial. The Petitioner subsequently made bond, and trial counsel began meeting with him at trial counsel's office. Trial counsel could not recall how many times he met with the Petitioner, but estimated it to be "at least seven or eight times." Trial counsel's assistant, who served as an interpreter, was also present during the meetings. Trial counsel testified that the Petitioner would sometimes bring family members to the meetings. Trial counsel testified that the Petitioner did not provide him with a list of potential witnesses.

Trial counsel asserted that the first plea offer was "some sort of split confinement, but it was very[,] very loose" and it "was never a firm offer." After discussing the loose offer, the Petitioner rejected it. The second offer was "a ten-year offer at a percentage." The Petitioner refused this offer, and the offer was subsequently rescinded after the State spoke with the victim. Trial counsel could not recall any other plea offers and testified that "a twenty-year-offer at thirty-five percent [] would have [been] rejected," reasoning that the Petitioner "didn't even want to go to jail when [they] were talking about a one-year [plea offer] and then [the Petitioner] rejected the ten years at a percentage." At the time of trial, the Petitioner still maintained his innocence.

Trial counsel asserted that he explained parole and parole eligibility to the Petitioner and "someone else that was with [the Petitioner]" during a meeting at trial counsel's office. Trial counsel could not recall the Petitioner's immigration status, but he testified that he usually explained the immigration consequences of these types of proceedings because his office had some experience with immigration work.

Trial counsel testified that the Petitioner had an issue paying for his entire retainer, but claimed that he would not "abandon somebody close to trial because of a financial issue[.]" Trial counsel averred that he did not become upset with the Petitioner over lack of payment and it was not an issue. Trial counsel could not remember the Petitioner's asking him to withdraw nor could he recall filing a motion to withdraw. Trial counsel did not represent the Petitioner at his sentencing hearing. Trial counsel testified that the Petitioner and the Petitioner's family "were upset with [] the outcome[] of the trial."

Trial counsel testified that his trial strategy was not to attack the victim's mother on "outside incidences." Likewise, trial counsel did not use an audio recording of

-5-

"threatening messages" from C. D. during trial. Trial counsel attempted to create reasonable doubt by proving that the victim was living in various locations with her mother and that the Petitioner had "no reason or ability to do some of the things [] he was charged with."

Trial counsel did not interview the victim prior to trial. Trial counsel spoke with the Petitioner about his charges and discussed the indictment. Trial counsel explained the possible sentencing range and the judge's ability for "stack[]" multiple sentences. These discussions were prompted by the plea offers, which the Petitioner rejected "because he did not want to go to jail again."

On cross-examination, trial counsel confirmed that he received discovery in the Petitioner's case and reviewed it with the Petitioner. Trial counsel reviewed the victim's forensic interview and informed the Petitioner of the contents. Additionally, trial counsel and the Petitioner discussed the Petitioner's decision to testify at trial on his own behalf. The Petitioner decided to testify, and trial counsel prepared the Petitioner for his testimony prior to trial.

Ines Palacios was the Petitioner's ex-sister-in-law and had known the Petitioner for eleven years. Ms. Palacios had been present for one meeting between trial counsel and the Petitioner. While at trial counsel's office, Ms. Palacios did not hear trial counsel decline offers on behalf of the Petitioner. However, while present in court with the Petitioner, Ms. Palacios did recall the Petitioner's telling trial counsel that he wanted to accept a plea offer, but she could not understand what the plea offer entailed.

Seccoro Moreno, the Petitioner's mother, testified that she was present during meetings between the Petitioner and trial counsel. During these meetings she "didn't understand [the conversation] really well." Ms. Moreno recalled trial counsel's relaying to the Petitioner an offer to serve one year, but trial counsel did not accept the offer because "[the Petitioner] had already spent six months in jail." Ms. Moreno asserted that trial counsel had declined the offer before speaking with the Petitioner.

Ms. Moreno testified that trial counsel charged her $6,500 to represent the Petitioner. Ms. Moreno would pay a portion "every week or every two weeks based [on her] financial standing[.]" Ms. Moreno's last payment to trial counsel was declined when trial counsel informed Ms. Moreno that he would not be representing the Petitioner any longer following the trial. Ms. Moreno did not witness trial counsel's becoming upset about lack of payment.

On cross-examination, Ms. Moreno testified that she paid trial counsel a total of $5,800. Ms. Moreno did not know how many times the Petitioner and trial counsel met

prior to trial. After the Petitioner was convicted, Ms. Moreno recalled the Petitioner's sending a letter to trial counsel in which he stated he did not want trial counsel to represent him any longer. Ms. Moreno was not present during the trial and was unaware of the amount of time or preparation that trial counsel had put into the Petitioner's case.

Alberto Diaz, the Petitioner's brother, testified that he was present during a meeting at trial counsel's office. During this meeting, trial counsel "had denied a[] [plea] offer of one year . . . because [the Petitioner] had already completed six months [in custody.]" Upon hearing this, Mr. Diaz witnessed the Petitioner become "angry." Mr. Diaz asserted that the relationship between the Petitioner and trial counsel began to "break[] down" prior to trial because trial counsel "wasn't showing up to court dates" and "wasn't communicating with [the Petitioner]."

On cross-examination, Mr. Diaz explained that the Petitioner was not present during the meeting at trial counsel's office because the Petitioner was still in jail. Mr. Diaz did not visit the Petitioner in jail and was aware of the Petitioner's reaction to the rejected plea offer because of telephone conversations with the Petitioner. Mr. Diaz asserted that the Petitioner was not angry or upset merely because he was in jail. Mr. Diaz testified that the Petitioner "was always very repetitive saying that he had" not committed the crimes he was charged with and that the Petitioner was "never willing to go to jail for it."

The Petitioner testified that he hired trial counsel upon learning he was being investigated for these allegations, but prior to speaking with the police. The Petitioner recalled signing paperwork with trial counsel retaining him for the amount of $3,500. The Petitioner asserted that trial counsel did not visit him while he was in jail.

The Petitioner recalled trial counsel's relaying a plea offer of twenty years to be served at thirty-five percent. Trial counsel had rejected this offer before informing the Petitioner about it. The Petitioner asked trial counsel to speak with the State to "give [the Petitioner] the same [plea offer] or another better offer." The Petitioner testified that he first heard about a split confinement offer during trial counsel's testimony. Regarding the plea offer to serve one year at one-hundred percent, the Petitioner asserted that he told trial counsel he wanted to take the offer, but trial counsel rejected the offer because the Petitioner had "already [done] six months in county jail and [the Petitioner] shouldn't have to do any more time."

The Petitioner asserted that he had written trial counsel a letter while in jail threatening to fire him. After posting bond, the Petitioner asked trial counsel to withdraw, but trial counsel did not think the judge would allow such a withdrawal "in the middle of trial." The Petitioner asked trial counsel to withdraw because "[trial counsel]

never came to visit [the Petitioner] in jail" and trial counsel became upset because of lack of payment before trial. Trial counsel had conducted the bond hearing with no advance payment.

The Petitioner asserted that trial counsel should have called Ines Palacios and Irene Reed to testify at trial. According to the Petitioner, Ms. Palacios would have testified that C. D. sent naked pictures, posing as Ms. Palacios, to men to break up Ms. Palacios's relationship with her significant other because the Petitioner was threatening to leave C. D. Additionally, Ms. Reed would have testified that C. D. "had coerced minors in the past to charge criminal allegations of sexual conduct[.]" The Petitioner contacted Ms. Reed and averred that she had never been contacted by trial counsel. The Petitioner did not call Ms. Reed to testify at the post-conviction hearing.

The Petitioner and trial counsel had discussed cross-examination of the victim's grandmother, A. R., and the Petitioner told trial counsel that A. R. "coerced" other minors to lie about similar allegations "in a separate unrelated incidence."

The Petitioner stated that he and C. D. had a falling out before the Petitioner was charged and that C. D. "threaten[ed] [the Petitioner] that if [he] reenlisted in the Army that she was going to make sure" to send him to prison. The Petitioner began recording conversations with C. D. and claimed that he had discussed these recordings and the contents with trial counsel. On redirect examination, the Petitioner testified that trial counsel did not explain that if he were convicted at trial, he would have to serve one-hundred percent of his sentence.

On cross-examination, the Petitioner testified that had he "been advised [of] the consequences of going to trial" and that if he had known or been advised of the "less probable" likelihood of success at trial under the circumstances, he would have "likely" taken a plea offer. The Petitioner recalled signing a contract with trial counsel, but had not asked counsel for a copy for his own records. The Petitioner had paid trial counsel $3,500 before trial. The Petitioner denied that trial counsel reviewed discovery with him, but said trial counsel gave him a "stack of documents" after the first day of trial and instructed the Petitioner to read the documents. The Petitioner did not read the documents because of his "mental state" at the time. The Petitioner asserted that he and trial counsel "never discussed the details of the allegations." In regards to trial preparation, the Petitioner said trial counsel only provided a baseball analogy.

The post-conviction court denied the Petitioner's claims in an order filed June 4, 2019. The post-conviction court found Ms. Moreno and Mr. Diaz's testimony "troubling" and credited trial counsel's testimony that he relayed all plea offers to the

Petitioner. The Petitioner timely filed a notice of appeal. The case is now before us for review.

## ANALYSIS

The Petitioner contends that the post-conviction court erred by denying him relief, arguing that trial counsel's performance was deficient because of his failure to communicate plea offers from the State and the Petitioner was prejudiced because he was not able to accept a plea offer and continued to trial. The State responds that relief was properly denied because the post-conviction court credited trial counsel's testimony that he had conveyed all plea offers.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847

S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The two-prong Strickland test further extends to plea offers with "defense counsel ha[ving] the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 566 U.S. 134, 145 (2012). Further, "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." Id. at 147. "Defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." Id. at 148.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

At the post-conviction hearing, trial counsel testified that he worked about "seventy to eighty hours total" on the Petitioner's case. Trial counsel testified that the

Petitioner maintained he "didn't do any of the things he was accused of" and did not want to serve jail time. Regardless, trial counsel asserted that he discussed a "loose" offer of split confinement with the Petitioner and that the Petitioner rejected the offer. Although trial counsel could not recall any other specific plea offers, he was sure the Petitioner would have rejected the offers because the Petitioner maintained his innocence through trial.

Ms. Palacios testified that she did not hear trial counsel reject an offer on the Petitioner's behalf and could only recall the Petitioner's telling trial counsel at trial that he wanted to accept an offer. Ms. Moreno testified that she was present for some meetings between the Petitioner and trial counsel, but she did not understand the conversations. Mr. Diaz testified that during a meeting at trial counsel's office, he learned that trial counsel had rejected a plea offer on behalf of the Petitioner; however, the Petitioner was not present during this meeting. Additionally, Mr. Diaz asserted that the Petitioner was adamant that he was innocent. The Petitioner testified that trial counsel had only relayed a plea offer from the State after trial counsel had rejected the offer.

In its order, the post-conviction court found that the witness testimony from Ms. Moreno and Mr. Diaz was "troubling" because trial counsel would have had to communicate "privileged information outside of the Petitioner's presence to the witnesses." The court credited trial counsel's testimony that he relayed all offers from the State to the Petitioner and that all offers were rejected because the Petitioner maintained his innocence and did not want to go back to jail.

The Petitioner has failed to show by clear and convincing evidence that trial counsel did not relay plea offers to him and thereby rendered deficient performance. The post-conviction court credited trial counsel's testimony, and the record supports its finding that trial counsel relayed all plea offers to the Petitioner. The Petitioner did not want to accept a plea offer and maintained his innocence through trial. Accordingly, we do not find any merit in the Petitioner's ineffective assistance claim.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-